Ethan J. Brown (*appearing pro hac vice*)
 ethan@bnsklaw.com
Sara C. Colón (4815908)
 sara@bnsklaw.com
**BROWN NERI SMITH & KHAN LLP**
11766 Wilshire Boulevard, Suite 1670
Los Angeles, California 90025
Telephone: (310) 593-9890
Facsimile: (310) 593-9980

*Attorneys for Plaintiff,*
Kelly D. Shapiro

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KELLY D. SHAPIRO, an individual; | Case No.: 1:16-cv-09152-PGG |
| Plaintiff, | |
| v. | |
| NFGTV, INC. d/b/a EASTERN; a New York Corporation; WE TV LLC, a Delaware limited liability company; and DOES 1-50, inclusive; | |
| Defendants. | |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS NFGTV, INC. d/b/a EASTERN AND WE TV LLC'S MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

I.    **INTRODUCTION**..............................................................................1

II.   **BACKGROUND FACTS** ................................................................2

    **A. The Participation Agreement and Ethics Clause** .................4

    **B. Defendants' Misrepresentations Come to Light** .................4

III.  **LEGAL STANDARD** .....................................................................6

IV.  **ARGUMENT** ...................................................................................7

    **A. The Participation Agreement was Procured by Fraud** ......7

    **B. Alternatively, if the Participation Agreement is not entirely void, Defendants cannot rely upon the Release because it was procured by fraud** ..7

        1. *Only settled claims for fraudulent inducement require a 'separate fraud' as discussed in Centro* .................8

        2. *Two cases characterizing reality-TV do not defeat Shapiro's claims or apply to the release in the Participation Agreement* .........11

    **C. Shapiro's Claim for Breach of the Covenant of Good Faith and Fair Dealing does not Run Contrary to the Participation Agreement.** ...................12

    **D. Shapiro's Claim for Defamation is Adequately Pleaded** ...................14

    **E. Shapiro's claims for Intentional Misrepresentation and Fraudulent Inducement are Adequately Pleaded** .................15

        1. *At most, the Merger, Acknowledgements & Assumptions only apply to NFGTV* .................15

        2. *Defendants' conclusion that Shapiro's claims are implausible should be given no weight* ..................17

    **F. Shapiro Requests Leave to Amend if the Motion to Dismiss is Granted** ........18

V.   **CONCLUSION** .............................................................................18

## TABLE OF AUTHORITIES

4 K & D Corp. v Concierge Auctions, LLC,
    2 F Supp 3d 525 [SDNY 2014]......................................................................17

Allegheny Corp v. Kirby,
    333 F.2d 327 [2nd Cir. 1964].....................................................................9, 10

Ashcroft v. Iqbal,
    556 U.S. 662, 678 [2009].................................................................................6

Bazzano v. L'Oreal, S.A., 93 Civ. 7121 (SHS),
    1996 US Dist LEXIS 6529 [SDNY May 13, 1996].........................................7

Bear Stearns Funding, Inc. v. Interface Group –Nev., Inc.,
    361 F Supp 2d 283 [SDNY 2005] .................................................................13

Bellefonte Re Ins. Co v. Argonaut Ins. Co.,
    757 F2d 523 [2d Cir 1985]......................................................................... 9-11

Bihag v. A&E TV Networks, LLC,
    669 Fed App'x. 17 [2d Cir 2016].................................................................12

Centro Empresarial Cempresa S.A. v América Móvil, S.A.B. de C.V.,
    17 NY3d 269 [2011] .............................................................................*passim*

Dannan Realty Corp. v. Harris,
    5 NY2d 317 [1959]........................................................................................17

DIRECTV Group, Inc. v Darlene Invs., LLC,
    2006 US Dist LEXIS 69129 [SDNY Sep. 27, 2006].......................................8

Goldsmith v. National Container Corp.,
    287 NY 438, 443 [1942].................................................................................8

Gonzalez v. 40 W. Burnside Ave., LLC,
    107 AD3d 542 [1st Dept 2013]......................................................................7

Henneberry v Sumitomo Corp. of Am.,
    415 F Supp 2d 423[SDNY 2006] ..................................................................18

In re Methyl Tertiary Butyl Ether Producs. Liab. Litig.,
    379 F Supp 2d 348 [SDNY 2005] ...................................................................7

Klapper v. Graziano,
    41 Misc 3d 401 [Sup Ct, Kings County 2013]..............................................12

Kwon v Yun,
    606 F Supp 2d 344 [SDNY 2009] ...........................................................15, 16

Ladenburg Thalmann & Co. v. Imaging Diagnostic Sys.,
    176 F Supp 2d 199 [SDNY 2011] ..................................................................7

Mangini v. McClurg,
    24 NY2d 556 [1969] .......................................................................................8

Pasqualini v. MortgageIT, Inc.,
    498 F.Supp.2d 659 [SDNY 2007] ...........................................................14

Pension Benefit Guar. Corp. v Morgan Stanley Inv. Mgmt.,
    712 F3d 705 [2d Cir 2013]........................................................................6

Perry v City of NY,
    13 Civ. 1015 (JMF), 2013 US Dist LEXIS 177396 [SDNY Dec. 17, 2013]...................6

Psenicska v. Twentieth Century Fox Film Corp.,
    07 Civ. 10972 (LAP), 2008 U.S. Dist. LEXIS 69214 [SDNY 2008]...........................16

Rentways, Inc. v. O'Neill Milk & Cream Co.,
    308 NY 342 [1955] ....................................................................................15

Sabo v. Delman,
    3 NY2d 155 [1957] ....................................................................................17

Tyson v. Cayton,
    784 F.Supp. 69 [SDNY 1992].....................................................................9

Usach v. Tickhman,
    11 Civ. 954 U.S. Dist. LEXIS 141155 [S.D.N.Y. 2011] ...................................8

## I.   **INTRODUCTION**

Plaintiff Kelly Shapiro agreed to participate in the reality TV series *Money. Power. Respect.* ("MPR") after numerous misrepresentations and lies by Defendant NFGTV, Inc. d/b/a Eastern's ("NFGTV") and WE TV, LLC's ("WE") (collectively, the "Defendants") producers and agents.   Defendants baited Shapiro into participating on MPR, promising that MPR would be different from the typical reality TV series that lacked any respectable character.

Shapiro made it apparent to the Defendants that she wanted to protect her reputation and career, through the negotiation of a clause that allowed her to object to certain scenes she believed would negatively reflect upon her reputation.   Shapiro's requirement that the show cast her in favorable light was also apparent to Defendants because, in response to her demand, Defendants ensured Shapiro and her colleagues, that Shapiro's image, reputation, and career would be protected.

Defendants made these representations knowing they were false because they at all times intended to create a typical reality TV series that demeaned and degraded Shapiro.   Indeed, Shapiro was forced to object to a scene that Defendants scripted for the very first episode that suggested the Shapiro had violated her ethical responsibilities as a lawyer.   In order to keep Shapiro as a participant Defendants reluctantly agreed to cut the scene, knowing they could retaliate later when Shapiro was powerless to stop them.

Then in the final episode, Defendants scripted co-participant Kendell Kelly to state that Shapiro defrauded one of her clients and stole money from that client.   This was no mere opinion by a participant in the show; the show's producers specifically orchestrated the events and the statements made by the other participant with the specific intent to make Shapiro look bad and to retaliate against her for exercising her legal right to preclude the similar incident in the first episode.   Although Defendants failed to inform Shapiro of the scene before it was filmed, Shapiro became aware of Defendants' actions before the scene aired.   Shapiro objected to the airing of the scene, but in retaliation to Shapiro's first objection, Defendants refused to pull the scene, providing the false excuse that it was simply too late and that it would be aired shortly

Defendants had no intention of honoring the representations that they made to Shapiro because they knew they were false when they made them.  Shapiro's claims are legally sufficient, and Defendants Participation Agreement is unenforceable as a result of Defendants' fraud.  Indeed, Defendants do not even dispute that Shapiro has adequately pleaded all elements of her claim, but merely conclude that Shapiro's claims are implausible.  Shapiro respectfully requests this Court deny Defendants' motion to dismiss.

## II.    **BACKGROUND FACTS**[1]

In July 2015, Defendant NFGTV approached Shapiro, hoping to convince her to participate in a reality-television series tentatively titled "Power of Attorney" or "Ladies of Law."  (Amended Complaint ("AC") ¶ 29.)  Through its agents, NFGTV indicated that the series would bolster and exemplify the daily lives and activities of minority female attorneys in the entertainment business.  (Id. ¶ 30.)

Defendants specifically stated that MPR (then otherwise tentatively titled), was departing from executive producer Mona Scott Young's ("Young") typical reality-television approach, that failed to demonstrate a positive depiction of black women.  (Id. ¶ 31.)  Defendants acknowledged that few, if any. reality television shows (including those of Mona Scott Young) favorably depict black women.  (Id.)

Defendants continued to mislead Shapiro, representing that "Ladies of Law" was a chance for the audience to watch an exciting TV show about the life of an attorney in the entertainment industry, featuring six black female attorneys who could serve as an example – in the sea of low-brow reality-television already flooding the airwaves – for a younger audience to aspire to.  (Id. ¶ 33.)

Defendants made these representations through not one, but numerous producers, including Tyler Prow ("Prow"), Kai Bowe ("Bowe"), Steven Drieu ("Drieu"), Rhonda Cowan ("Cowan"),

---

[1] Defendants acknowledge that the facts as alleged must be taken as true, yet include in their "factual background" numerous statements that appear nowhere in the Amended Complaint. Defendants are improperly attempting to create a factual record for this motion to dismiss that does not exist. *See e.g.* Motion p. 3 ("Defendant Eastern is the creator and producer of popular, unscripted reality-television content…") These facts appear nowhere in the Amended Complaint.

and Mona Scott Young ("Young").  (Id. ¶¶ 33-42.)  On or around July 8, 2015, Shapiro spoke with Prow, a producer of WE TV, who assured her that MPR would cast her in a favorable light and that she need not worry about her reputation or career in participating in the show.  (Id. ¶ 33.) Prow specifically stated that Shapiro need not worry because they would "never do anything to hurt [her] career." (Id.)  Prow even made the same representations to an associate of Shapiro's and CEO of Thesis Couture, Dolly Singh. (Id. ¶ 34.)  Ms. Singh was also concerned that Shapiro's reputation and career would be injured by her participation in MPR. (Id.)  Singh expressed that her impression that NFGTV and (Young's production company) Monami Productions made other series that lacked any respectable character.  (Id.)  Prow reiterated to Singh what he previously represented to Shapiro, that MPR would not be the "typical trashy" reality TV from their companies, citing specifically to "Love & Hip Hop" as an example of what MPR would not be. (Id. ¶ 35.)

Later that year in September, Shapiro met with Prow, Bowe, Drieu, and Cowan to further discuss her concerns with participating on the show and how her participation could be detrimental to her relationship with Singh and Thesis Couture.  (Id. ¶¶ 37 & 38.)  All of Defendants' agents expressed that Shapiro should not be concerned, that she would only be favorably portrayed, and that participating in the show would be beneficial to her career.  (Id. ¶ 39.)  At that meeting, Cowan specifically emphasized that MPR would be a chance for the world to see professional, black women on television and in a favorable light.  (Id. ¶ 40.)  On another occasion that same month, Bowe again reiterated to Shapiro that her image and reputation would be highlighted rather than denigrated. (Id. ¶ 41.) Finally, from the day she was first introduced to producer Mona Scott Young, Young repeatedly dismissed any concerns that MPR would be similar to the reality TV shows she previously produced, and specifically different from "Love & Hip Hop." (Id. ¶ 42.)

It was based solely on these numerous representations that Shapiro agreed to participate in MPR.  (Id. ¶ 43.)  Had Shapiro known that Defendants intended to defame and disparage her, she would not have participated. (Id. ¶ 46.)

/ / /

/ / /

**A.  The Participation Agreement and Ethics Clause**

Shortly after Shapiro spoke with Defendants' agents, Defendants presented Shapiro with a Participation Agreement (the "Agreement") for MPR.   As Defendants knew through their conversations, Shapiro wanted to ensure that her reputation was protected.  In order to protect her reputation, Shapiro negotiated a provision to object to the filming of certain scripts or scenes (the "Ethics Clause"). (Id. ¶ 49.)  The Ethics Clause expressly provides:

> "Producer agrees that if I object to an act required by Producer (prior to filming or other recording of such act) based on my reasonable good faith belief that my performance of such act will cause me to directly violate a rule of professional conduct applicable to me, I may provide such objection in writing to Producer with a specific reference to the text of such rule. Provided that Producer's independent analysis (to be performed in good faith) concludes that my belief is reasonable, my failure to perform such action shall not be deemed a breach of this Agreement. For clarity, any such objection must be made prior to filming, and Producer shall have the right to use all recordings of me hereunder in accordance with the terms of this Agreement." (Id., Ex. 1, ¶ 2(a).)

The Ethics Clause was negotiated as an express exception to clause 12(c) which states that certain actions of other participants may constitute defamatory or derogatory conduct.  Nothing in that provision, however, permits the producers to script scenes for other participants to suggest ethical violations of Shapiro in retaliation for her exercising the contractual rights outlined above. Under those provisions combined, any defamatory or derogatory conduct filmed cannot implicate any attorney ethics rules. (Id. ¶ 51.)  Shapiro had made it clear that she was not participating in Defendants show to allow them to defame her, and Defendants repeatedly assured her that they would not.  (Id. ¶ 54.)

**B.  Defendants' Misrepresentations Come to Light**

Upon the filming of the first scene (the "First Objectionable Scene"), Defendants attempted to use co-participant Kendall Kelly ("Kelly") to disparage Shapiro.  (Id. ¶ 56.)  In the First Objectionable Scene, Defendants scripted Kelly to question Shapiro's ethics as to her law practice to another co-participant, going against all of their representations that MPR would only cast

Shapiro in a favorable light. (Id. ¶ 57.)  Shapiro immediately objected to the airing of the First Objectionable Scene, and refused to participate any further if Defendants did not cut the scene. (Id. ¶¶ 58 & 59.)  As a result, Shapiro spoke with Young, who requested that Shapiro provide access to certain high-profile clients and colleagues, and obtain their consent to appear on MPR. (Id. ¶ 60.)  Shapiro stated that she would approach these individuals, but could guarantee nothing as to their willingness to participate.  (Id. ¶ 61.)  Defendants agreed to cut the First Objectionable Scene. (Id. ¶ 60.)  Defendants' conduct shows that they knew the deal was that they could not cast Shapiro as having violated her ethical obligations as a lawyer.

Throughout the filming, Shapiro constantly had to keep checks on Defendants.  (Id. ¶ 62.) While searching WE TV's YouTube page for clips to show her mother, Shapiro discovered that WE TV named certain clips "Jealous Hatin' Hoe," and "Tiffany Is A Bum."  (Id. ¶ 63.)  Only after confronting WE TV and demanding that the titles be changed, were they.  (Id.)  On or around January 4, 2016, Shapiro lodged a formal objection with Defendants, objecting to filming with certain cast members – alluding to the First Objectionable Scene and Kelly. (Id. ¶ 64.)  In this formal objection, Shapiro cited to Cal. Rules of Prof'l Conduct Rule 1-300, 1-310, 1-400, and NY CLS Rules Prof Conduct R 5.5 and 7.1.  (Id. ¶ 66.)

Then, for the season finale, Defendants found their chance to retaliate against Shapiro.  (Id. ¶ 67.)  Like before, Defendants scripted Kelly to state that Shapiro defrauded a client and stole her client's funds, while simultaneously identifying said client in the scene. (Id. ¶ 69.)  Such claims accuse Shapiro of violating various ethical obligations and Rules of Professional Conduct. (Id. ¶ 70.)  Here, however, Defendants concealed the scene from Shapiro until after it was filmed. (Id. ¶ 71.)  On information and belief, Defendants did so to prevent Shapiro from objecting under the terms of the parties' contract. (Id.)

Shapiro learned of the scene shortly before it was aired on television, lodged an objection and requested that Defendants cut it. (Id. ¶ 72.)  Defendants refused to honor Shapiro's objection and request, and aired the scene to the detriment of Shapiro. (Id. ¶ 73.)  Although the scene contained conduct contemplated by the Ethics Clause, Defendants, on information and belief, knew that Shapiro could no longer threaten to refuse to participate because the scene was in the

season finale. (Id. ¶ 74.)   On information and belief, Defendants took advantage of this fact, intentionally scripted the scene to retaliate against Shapiro for her previous objections and for her failure to obtain the consent of her high-profile clients to appear on MPR.  (Id. ¶¶ 75-77.)

On November 17, 2016, Defendants aired the scene causing significant harm to Shapiro. (Id. ¶¶ 78-79.)

## III.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" (Ashcroft v. Iqbal, 556 U.S. 662, 678 [2009]).  "In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. The Court will not dismiss any claims unless Plaintiff has failed to plead sufficient facts to state a claim to relief that is facially plausible."  (Perry v City of NY, 13 Civ. 1015 (JMF) 2013 US Dist LEXIS 177396, at *40-41 [SDNY Dec. 17, 2013] (citations omitted).)

"As the Supreme Court has explained, this standard creates a "two-pronged approach," based on "[t]wo working principles[.]" First, although a complaint must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation" but need not include detailed factual allegations. Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." This "facial plausibility" prong requires the plaintiff to plead facts "allow[ing] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." (Pension Benefit Guar. Corp. v Morgan Stanley Inv. Mgmt., 712 F3d 705, 717-718 [2d Cir 2013] (citations omitted).)

"The task of the court in ruling on a Rule 12(b)(6) motion is 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in

support thereof.'" (In re Methyl Tertiary Butyl Ether Producs. Liab. Litig., 379 F Supp 2d 348, 367 [SDNY 2005].)

## IV.  ARGUMENT

Plaintiff's Amended Complaint adequately satisfies these standards and Plaintiff respectfully requests this Court deny Defendants' Motion.

### A.  The Participation Agreement was Procured by Fraud

Defendants argue that the release and covenant not to sue bars Shapiro's claims, but the entire Participation Agreement is voidable as it was fraudulently induced. "It is well-settled in New York that where a party is fraudulently induced to enter into a contract, the contract is voidable at the instance of the defrauded party."  (Bazzano v. L'Oreal, S.A., 93 Civ. 7121 (SHS), 1996 US Dist LEXIS 6529, *7 [SDNY May 13, 1996].)  "A plaintiff seeking to invalidate a release due to fraudulent inducement must 'establish the basic elements of fraud, namely a representation of material fact, the falsity of that representation, knowledge by the part who made the representation that it was false when made, justifiable reliance by the plaintiff, and resulting injury." (Centro Empresarial Cempresa S.A. v América Móvil, S.A.B. de C.V. ("Centro"), 17 NY3d 269, 276 [2011].).  As conceded to by Defendants, Plaintiff has adequately alleged all elements of a fraudulent inducement claim, and because the Participation Agreement is not a settlement agreement, Defendants' motion to dismiss should be denied.  Defendants have not disputed that Shapiro sufficiently alleges all elements for a cause of action for fraudulent inducement, and thus the entire contract, not solely the release are voidable by Shapiro.

### B.  Alternatively, if the Participation Agreement is not entirely void, Defendants cannot rely upon the Release because it was procured by fraud

Even if only the Release was subject to Shapiro's fraudulent inducement claim, the same standard applies.  "Where fraud in the procurement of a release is alleged, a motion to dismiss should be denied." (Gonzalez v. 40 W. Burnside Ave., LLC, 107 AD3d 542, 544 [1st Dept 2013].) "[I]f a party is fraudulently induced to execute a release, the release is a voidable contract and may be voided by the defrauded party." Ladenburg Thalmann & Co. v. Imaging Diagnostic Sys., 176 F Supp 3d 199, 204 [SDNY 2011]); see also Goldsmith v. National Container Corp., 287 NY 438,

443 [1942] [reversing judgment based on a defendant's defense that a contractual release barred an action for fraudulent inducement.])

Thus, the Release is void and unenforceable.

1. *Only settled claims for fraudulent inducement require a 'separate fraud' as discussed in Centro*

Defendants have argued that in order to invalidate a release the party must identify a "separate fraud" and rely on Usach v. Tickhman (11 Civ. 954 US Dist LEXIS 141155 [S.D.N.Y. 2011]) and Centro to support this proposition.  All of this case law is inapposite because it applies only in the context of a settlement or a purchase agreement coupled with a settlement and release. Defendants' exclusive reliance on inapposite authority makes evident the failure of their arguments.

Only a party seeking to void a release in the context of a settlement agreement must allege a separate fraud.  "[A release] is a jural act of high significance without which the **settlement** of disputes would be rendered all but impossible.  It should never be converted into a starting point for **renewed litigation** except under circumstances and under rules which would render any other result a grave injustice.  It is for this reason that traditional bases for setting aside written agreements, namely, duress, illegality, fraud, or mutual mistake, must be established or else the release stands." (Centro, supra, 17 NY 3d at 316 [2011] *citing* Mangini v. McClurg ("Mangini"), 24 NY2d 556, 563 [1969] (emphasis added).)  "Where the 'new fraud' is 'a species of the same…fraud' underlying the original agreement, the claim is deemed release." (DIRECTV Group, Inc. v Darlene Invs., LLC, 2006 US Dist LEXIS 69129, at *11 [SDNY Sep. 27, 2006].)

As indicated in the appellate division proceeding of Centro (76 AD3d 310 [1st Dept 2010]), the Plaintiffs sought to void a transaction where they sold their minority interest in an Ecuadorian telephone company, based on the alleged misrepresentations of the defendants.  (Id. at 311.) Plaintiffs alleged that, when they sought to enter into negotiations for the sale of their interests, the Defendants failed to provide them with their internal 'financial information' and business plans. (Id. at 313.)  Plaintiffs alleged that any information that was eventually provided painted a picture that the Defendants' company was "financially distressed with uncertain prospects[,]" thus

reducing the overall value of the plaintiffs' interest. (Id.)  Having been part of all of these interactions with the defendants, the plaintiffs nonetheless agreed to sell their interest at the floor price, and executed a broadly drafted mutual release, releasing the defendants "from all manner of actions, causes of action, suits, debts, dues, sums of moneys…liability [*sic*], whatsoever, in law or equity, whether past, present future, actual or contingent, arising under or in connection with the Agreement[.]" (Id.)  When the true value of the minority interest came to light from a tax audit of the defendants, the plaintiffs sued and sought to void the release on the grounds of fraudulent inducement. (Id. at 315.)

The court refused to void the release, holding that plaintiffs were "essentially asking to be relieved of the release on the ground that they did not realize the true value of the claims they were giving up, namely, their claims for the value of their [minority] interest[.]" (Id.)  The court went on to hold "a party cannot overturn the **settlement** of a dispute as to a particular matter (here the value of [the minority interest business] on the ground that "it reasonably relied on a representation by [its adversary], in …[the] **settlement negotiations**, as to that exact point." (Id. [emphasis added].)  The court held that plaintiffs' claim for fraudulent inducement failed because the only issues alleged were related to the value of the minority interest business – the issue plaintiffs settled and not a "separate and distinct" fraud.  (Id. at 317).

In the context of a settlement agreement or an agreement coupled with a settlement agreement, the Centro court makes clear that "[w]hen a party releases a claim for fraud, it can later challenge that release for fraudulent inducement only by identifying a separate and distinct fraud from that contemplated by the agreement." (Id. at 318.)

From the case law cited in Centro by the appellate division, and affirmed by the 2nd Circuit Court of Appeals (*see* 17 N.Y.3d 269), the logic of requiring a "separate and distinct" fraud outside of a settlement context is made clear through the cites to Allegheny Corp v. Kirby (333 F.2d 327 [2nd Cir. 1964]) and Bellefonte Re Ins. Co v. Argonaut Ins. Co. (757 F2d 523 [2d Cir 1985], and many others.  (*See also* Tyson v. Cayton, 784 F Supp 69, 75 [SDNY 1992] ["The policy underlying Alleghany and Bellefonte applies with equal force to the case at bar.  The purpose of a **settlement** is to end litigation, not provide a breather for the next round [emphasis added].)

In <u>Allegheny</u>, Plaintiffs appealed a court-approved settlement that resulted from a shareholders' derivative suit against the defendants for fraud.  (<u>Id.</u> at 327-329.)  After the court approved the settlement over the shareholders' objections, the Plaintiff brought suit claiming the settlement was fraudulently induced, because the defendants failed to disclose all information related to their misconduct for the court to take into consideration in approving the settlement. (<u>Id.</u> at 328.)

The <u>Allegheny</u> court held that "even fraud cases can often be ***settled***.  A ***settlement*** is the price of peace.  ***There is no prerequisite to the settlement of a fraud case*** that the defendant must come forward and ***confess to all of his wrongful acts in connection with the subject matter of the suit***.  Usually such ***settlements*** are accompanied by vigorous denials of any fraud whatsoever." (<u>Id.</u> at 333 [emphasis added].)  In addressing appellants' argument that not all information was disclosed, the court stated "[a]t most [the non-disclosed documents] would have been but cumulative evidence upon the basic issue of [defendant's] fraud in acquiring the IDS stock at a grossly inadequate price.  ***But this fraud gave rise to the stockholders' suit and for this fraud he paid the settlement price***." (<u>Id.</u> at 334 [emphasis added].)

Thus, when a plaintiff chooses to settle litigation and release "any and all claims, etc." related to that litigation, the plaintiff must demonstrate a collateral, or "separate and distinct" fraud to set aside the release for fraudulent inducement.

Similarly, in <u>Bellefonte</u> (757 F2d 523 [2d Cir 1985]), the plaintiffs had entered into reinsurance agreements with the defendant.  When the defendant had a dispute with the company who held the insurance policies subject to the plaintiffs' reinsurance policies, the plaintiffs stopped making payments to the defendant that arguably covered the insurance losses.  (<u>Id.</u> at 525.) Subsequently, disputes arose between the plaintiffs and defendant, who all entered into respective *settlement agreements*. The settlement agreements resolved the issues between the parties, and contained a covenant not to sue, encompassing "any and all matters arising out of the dispute regarding the contracts of reinsurance."  (<u>Id.</u>)

The plaintiffs then brought suit against the defendant, and sought rescission of the settlement agreements "on the ground that [defendant] had fraudulently induced it to enter into the

agreement by not disclosing relevant material facts that [defendant] had a duty to disclose." (Id.) The court held "[p]laintiffs cannot rely freely, and for consideration, promise not to sue for failure to disclose material facts and then claim that the promise was fraudulently induced because material information was, in fact, not disclosed.  A claim for fraudulent non-disclosure, like any other claim, can be settled without litigation." (Id. at 526.)  As in Alleghany, the court's decision in Bellefonte was also based on the context of a settlement agreement.

Unlike the plaintiffs in Centro, Allegheny, or Bellefonte, Shapiro did not settle any claims - let alone any fraud claims - with Defendants.  Defendants' fraudulent misrepresentations induced Shapiro into executing the Participation Agreement and those actions form the basis of her fraud claim.  There can be no "new fraud" that is "a species of the same…fraud" as required in cited cases, because Defendants' could have honored their statements subsequently, and Shapiro had not yet been damaged. Although the misrepresentations were made prior to the Participation Agreement being executed, the fraud did not materialize and cause damage to Shapiro until Defendants filmed the defamatory scene.   All of Defendants' case law relies upon Centro, Allegheny, and Bellefonte, which demonstrates that a "separate and distinct" fraud, is required in settlement context.

Nor is Shapiro attempting to renew litigation that was settled.  Defendants paid no price for their fraud.  Defendants included this release in an attempt to preclude Shapiro from obtaining the redress for their future actions that they knew would subject them to liability.   Allowing Defendants to benefit from intentionally defrauding Shapiro only to injure her reputation would be the "grave injustice" that Mangini stated should be avoided.

Accordingly, the release is not valid for the arguments advance by Defendants.

2.   *Two cases characterizing reality-TV do not defeat Shapiro's claims or apply to the release in the Participation Agreement*

Defendants' reliance on two cases regarding reality shows falls short in establishing *repeated* court precedent for applying release in the context of reality shows.  As stated in Shapiro's response to Defendants' second pre-conference letter, Klapper v. Graziano ("Klapper") (41 Misc 3d 401 [Sup Ct, Kings County 2013]) is inapposite.  The plaintiff in Klapper sued VHI

for various statements that were made following the airing of a plastic surgery operation that occurred in an episode.  Unlike Shapiro, the plaintiff in Klapper had "no claim that plaintiff was coerced or fraudulently induced to sign the appearance release."  (Id. at 361.)  Defendants argue that the Court should rely upon the dicta of that case which states that reality TV "offers opportunities for embarrassing and insulting participants and the more outlandish the conduct the higher the ratings[.]"  Such reliance by the Court here would be unreasonable when the producers sold the show in question to Shapiro on the very ground that the show in question would be different: it would not belittle and embarrass the participants like Shapiro.  Shapiro has specifically alleged that Defendants promised her repeatedly that their show would be different from the stereotype the Klapper court referenced.  [AC ¶¶ 35 & 42.].

Furthermore, the Court in Bihag v. A&E TV Networks, LLC (669 Fed App'x. 17 [2d Cir 2016]) did not address any fraudulent inducement claim either.  Although the plaintiff in Bihag brought claims for negligent misrepresentation and fraud, those issues were not addressed on appeal.  (Id. at 18.)

Thus, Defendants' argument that "New York Courts have repeatedly held, in decisions that are directly applicable to and dispositive of plaintiff's claims that general releases entered into participants by reality television shows bar *any* claim – including claims arising after the releases are signed—related to the plaintiffs' participation in those shows" fails.

### C.  Shapiro's Claim for Breach of the Covenant of Good Faith and Fair Dealing does not Run Contrary to the Participation Agreement

Shapiro's claim for Breach of the Implied Covenant of Good Faith and Fair Dealing does not contradict the terms of the Participation Agreement and is sufficiently pleaded.  "Under New York law, all contracts contain an implied agreement that neither party may engage in conduct which would interfere with the other party's rights to realize the benefit of the bargain, even if such conduct is not specifically prohibited by the contract…[c]onsequently, a party may breach the implied covenant of good faith and fair dealing even if that party's conduct does not contravene the express provisions contained within the four corners of the document." (Bear Stearns Funding, Inc. v. Interface Group –Nev., Inc., 361 F Supp 2d 283, 298 [SDNY 2005] (citations omitted).)

According to Shapiro's allegations, Defendants intentionally scripted the Second Objectionable Scene (1) in retaliation to Shapiro's objection to the First Objectionable Scene, (2) for her complaints regarding Defendants' rude, insulting, and misogynistic behavior, and (3) for her inability to obtain her clients' consent to participate in MPR.  (AC ¶ 69, 74-77.)  All that the Participation Agreement states is that "the Project *may* consist of opinions and/or statements about, or conduct affecting, me made by or engaged in by other participants, or other people connected with the Project[.]" (AC Ex. 1, ¶ 12(c).)

Defendants argue that this paragraph "expressly permits Defendants to present alleged defamatory third-party statements about plaintiff in the Series – and fails for that reason alone." (Motion p. 17.)  But the paragraph does not expressly permit Defendants to script defamatory content regarding Shapiro in retaliation for her conduct throughout the series.  The case law states that a defendant's conduct may breach the implied covenant of good faith and fair dealing "even if that party's conduct does not contravene the express provisions contained within the four corners of the document."  (Bear Stearns, supra, 361 F Supp 2d at 289.)  Defendants' discretion is not permission to intentionally script retaliatory defamatory conduct, but rather is at best an allowance to use such content if it is improvised.  As the allegations of Plaintiff's complaint must be taken as true, Defendants scripting this scene can still breach of the covenant of good faith and fair dealing because it does not expressly contravene any contract provisions.

Defendants knew that Shapiro wanted to protect her reputation through the negotiation of the Ethics Clause.  Shapiro (and others associated with Shapiro) expressed her concerns on multiple occasions that Shapiro would not participate in MPR if her reputation was not protected. Defendants had no obligation to prevent any participants from performing in any improvised manner, but Defendants could not intentionally script other participants to defame Shapiro.  The Participation Agreement gave Defendants no such authority.  Additionally, the Defendants do not have to exercise discretion to include any content, but could exclude anything they wanted.  Since Defendants refusal to exclude such defamatory content, provides an inference, in addition to Shapiro's allegations, that Defendants intentionally scripted the defamation.

For the foregoing reasons, Defendants' Motion as to Shapiro's cause of action for breach of the implied covenant of good faith and fair dealing should be denied.

### D.  Shapiro's Claim for Defamation is Adequately Pleaded

The Participation Agreement does not expressly permit Defendants to script Shapiro's co-participants to defame Shapiro and thus her claim for defamation is sufficiently plead.  To establish a cause of action for defamation under New York law, a private figure plaintiff must plead the following elements: (1) a false and defamatory statement of and concerning the plaintiff; (2) publication by defendant of such a statement to a third party; (3) fault on part of the defendant; and (4) injury to [the] plaintiff. (Pasqualini v. MortgageIT, Inc., 498 F Supp 2d 659, 670 [SDNY 2007].)  Defendants do not contest whether Shapiro adequately pleaded a claim for defamation, but rather argue that the claim was either released, or that Shapiro waived it.

The Participation Agreement does not permit Defendants' to script and then air a defamatory statement.  Instead, the Participation Agreement states that "I acknowledge that the Project may consist of opinions and/or statements about, or conduct affecting, me made by or engaged in by other participants or other people connected with the Project, and that some of these opinions, conduct and/or statements may be considered surprising, humiliating, embarrassing, false, derogatory, defamatory, or otherwise offense and injurious to me[,]  I acknowledge and agree that Producer shall have the right to include any such information and any such appearance, depiction, portrayal, actions and statements in the Project as edited by Producer in its sole discretion." (AC Ex. 1, ¶ 12(c).)  At most, this language allows Defendants to "include" statements made by other participants.  Disclaiming that other participants *may* engage in defamatory conduct, does not disclaim that Defendants will intentionally script such conduct, much less to do so maliciously in retaliation for Shapiro exercising her contractual rights.

Defendants' argument that "other people connected with the [Series]" includes Defendants is implausible.  Defendants as entities, are expressly defined throughout the Participation Agreement, and if Defendants intended to convey to Shapiro that they would intentionally script defamatory conduct, they should have expressly stated so.  They did not, and "where there is ambiguity in the terms of a contract prepared by one of the parties, 'it is consistent with both reason

and justice that any fair doubt as to the meaning of its own words should be resolved against' such party." (Rentways, Inc. v. O'Neill Milk & Cream Co. 308 NY 342, 348 [1955].)

Accordingly, Shapiro's claim for defamation is sufficient.

### E.  Shapiro's claims for Intentional Misrepresentation and Fraudulent Inducement are Adequately Pleaded

Shapiro's claims for intentional misrepresentation and fraudulent inducement are adequately pleaded, not implausible, and not precluded by the merger clause or contractual representations. "The elements of common-law fraud and intentional misrepresentation under New York law are the same.  In either case, a plaintiff must show that: "(1) the defendant made a material false statement or omission; (2) the defendant intended to defraud the plaintiff; (3) the plaintiff reasonably relied upon the representation or omission; and (4) the plaintiff suffered damage as a result of such reliance." (B&M Linen, Corp. v. Kannegiesser, USA, Corp. 679 F Supp 2d 474, 480 [SDNY 2010].)   "The elements of fraudulent inducement are substantially the same as those for common law fraud." (Sawabeh Info. Servs. Co. v. Brody, 11 Civ. 4164 (SAS), 2014 US Dist LEXIS 1050, at *32 [SDNY Jan. 6, 2014].)

Defendants do not argue that Shapiro has failed to adequately allege the elements of intentional misrepresentation or fraudulent inducement; Defendants only allege that Shapiro's claims are (1) contrary to the Participation Agreement integration clause; (2) contrary to the acknowledgements and assumptions of risk and contractual disclaimers; and (3) are implausible.

#### 1.  *At most, the Merger, Acknowledgements & Assumptions only apply to NFGTV*

First, "a general merger clause is ineffective . . . to preclude parol evidence that a party was induced to enter the contract by means of fraud. Thus, even when the contract contains 'an omnibus statement that the written instrument embodies the whole agreement, or that no representations have been made, a party may escape liability under the contract by establishing that he was induced to enter the contract by fraud." (Kwon v Yun, 606 F Supp 2d 344, 358 [SDNY 2009].)   An exception only exists where "a contract…contains explicit disclaimers of the specific representations that form the basis of the claim for fraudulent inducement." (Id. at 359; *see also* Psenicska v. Twentieth Century Fox Film Corp., 07 Civ. 10972 (LAP), 2008 U.S. Dist. LEXIS

69214, at *22 [SDNY 2008] [finding a merger clause precluding fraudulent inducement where the clause stated plaintiff has not relied 'upon any promises or statements **made by anyone** about the nature of the Film or identity of any other Participants or persons involved in the Film."].)

Here, the integration clause, by itself is too general.  Paragraph 27(b) states "This Agreement contains the entire understanding between the parties, and supersedes all prior negotiations, understandings and agreements (whether written or oral) of the parties hereto relating to the subject matter herein, and this Agreement cannot be changed or terminated except by a writing signed by both Producer and me. I acknowledge that I have not relied upon any statement or representation, express or implied, of Producer and/or the WE Parties (or any employee or agent of Producer and/or the WE Parties) other than as specifically and explicitly set forth herein in agreeing to and entering into this Agreement." (AC Ex. 1, ¶ 27(b).

Although paragraphs 12(b) and 12(c) respectively state that "**Producer** makes no representations and warranties with respect to the content and nature of the Project[,]" and that "I further understand that my appearance, depiction, and/or portrayal in the project...may be disparaging," these paragraphs must be limited to the actions of the "Producer" as expressly stated. (AC Ex. 1, ¶¶ 12(b) & (c) [emphasis added].)   According to the Participation Agreement, "Producer" is defined as "NGFTV, Inc. d/b/a Eastern" and does not include WE TV. Thus, any representations made by the WE TV Defendants are not expressly disclaimed.

Furthermore, "there is no authority that we are required to follow in support of the proposition that a party who has perpetrated a fraud upon his neighbor may, nevertheless, contract with him in the very instrument by means of which it was perpetrated, for immunity against its consequences, close his mouth from complaining of it and bind him never to seek redress.  Public policy and morality are both ignored if such an agreement can be given effect in a court of justice. The maxim that fraud vitiates every transaction would no longer be the rule but the exception.  It could be applied then only in such cases as the guilty party neglected to protect himself from his fraud by means of such a stipulation.  Such a principle would in a short time break down every barrier which the law has erected against fraudulent dealing." In other words, "the law does not temporize with trickery or duplicity.  A contract, the making of which was induced by deceitful

methods or crafty device, is nothing more than a scrap of paper, and it makes no difference whether the fraud goes to the factum, or whether it is preliminary to the execution of the agreement itself." (Sabo v. Delman ("Sabo"), 3 NY2d 155, 161-162 [1957].)  To the extent that Dannan Realty Corp. v. Harris, seeks to limit Sabo's application, that limitation cannot apply to any representations made by the WE TV. (5 N.Y.2d 317, 320 [1959]; see also Id. (Dissent, J. Fuld ["If a party has actually induced another to enter into a contract by means of fraud – and so the complaint before us alleges – I conceive that language may not be devised to shield him from the consequences of such fraud].)

Thus, even if the contract is found to expressly disclaim any representations, it could only be those made by Defendant NFGTV, and not WE TV, and thus the claim for fraudulent inducement and rescission is sufficient.

2.   *Defendants' conclusion that Shapiro's claims are implausible should be given no weight*

Defendants belief and conclusion that Shapiro's claims are implausible are irrelevant.  "The Court should not dismiss the complaint if the plaintiff has stated 'enough facts to state a claim to relief that is plausible on its face.' 'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' While the Court should construe the factual allegations in the light most favorable to the plaintiff, 'the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions.'" (4 K & D Corp. v Concierge Auctions, LLC, 2 F Supp 3d 525, 533 [SDNY 2014].)  Here, all of Shapiro's allegations are factual contentions and none are legal conclusions.  Shapiro has alleged that multiple agents of Defendants, on multiple occasions, to Shapiro and her colleagues, made various misrepresentations about how Defendants would create MPR, how Defendants would diverge from their typical content, how Shapiro's reputation would be protected, and how Shapiro should not be concerned about her reputation.  (AC ¶¶ 31-35 and 37-42.)

Nor are Defendants' misrepresentations subjective opinions as argued by Defendants. Shapiro was assured by the Defendants that they would not portray her unfavorably, that she did

not have to be concerned about her reputation or career as a result of appearing on MPR, and that she would not be disparaged. (AC ¶¶ 33 & 34.)  A representation that someone would not be disparaged is not a statement of subjective opinion.

Significantly, Defendants did not make the argument that they did in their first pre-motion conference request that Shapiro failed to sufficiently allege the elements for a claim for fraudulent inducement and intentional misrepresentation.  (Dkt. No. 17, p.4, n. 2.)  Defendants have conceded that Shapiro sufficiently alleges all elements for her claims, yet at the same time claim that they are not plausible.

Shapiro has sufficiently alleged claims for fraudulent inducement and intentional misrepresentation and the Court should deny Defendants' motion.

### F.  Shapiro Requests Leave to Amend if the Motion to Dismiss is Granted

In the event the Court grants Defendants' Motion to Dismiss, Shapiro respectfully requests she be granted leave to amend.  "When a district court grants a defendant's motion to dismiss a plaintiff's claims…the 'usual practice' dictates that the court grant the plaintiff leave to amend its complaint. (Henneberry v Sumitomo Corp. of Am., 415 F Supp 3d 423, 436 [SDNY 2006].)

## V.   CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss in its entirety.  If the Court grants Defendants' Motion, Shapiro respectfully requests leave to amend her complaint.

Dated: June 20, 2017                               **BROWN NERI SMITH & KHAN, LLP**

By: _____
        Ethan J. Brown

Ethan J. Brown
Sara C. Colón
11766 Wilshire Blvd., Ste. 1670
Los Angeles, CA 90025
T: (310) 593-9890
F: (310) 593-9980
*Attorneys for Plaintiff Kelly Shapiro*